Surgical Navigation v. Brianlab Medtronic Plaintiff's deliberate distortion of the court's claim construction rulings. Would you respond to that, please? Yes. And the district court said that. I frankly believe what the district court took exception to was the presentation of the Doctrine of Equivalence case. And I think the district court viewed it. My view of this is that the district court took a very literal view of each of the four patents, took a literal view of the prosecution history. I think the district court felt that by presenting the Doctrine of Equivalence case, that was trying to do an end around on the claim construction, whereas. That's not a way out concept, is it? Well, it's not. But in the context of this case, Your Honor, I think when you look at the range of evidence that we put together, and that was presented at trial, right down the line on the rules on Doctrine of Equivalence, with interchangeability, function way resolved, extensive evidence on both, that it was an appropriate presentation. And the trial counsel, I will say, made it clear at the summary judgment stage after the claim construction that they intended to bring a Doctrine of Equivalence case. If I could continue just briefly on the evidence that supports the verdict, I'd point the court out there's a very fulsome function way result analysis with respect to the 454 patent, and using the camera arrays as an equivalent to the microphone arrays that begins at joint appendix 7513 and ends at 7576. And in that, they covered both the test, the off-the-shelf nature of the tracking unit. They related it to the tracking function, the doing the sensing in the same way. Also addressed the active and passive and acoustic versus optical issue. You know, the problem I have with the way you framed the equivalence argument, and I don't mean to prejudge how it ought to be assessed, but just the way you framed it is that to say that they're interchangeable, I've always had a little difficulty with how amorphous that term is. I mean, a piston engine is interchangeable, I suppose, with a hybrid engine. But no one would say that an invention to a hybrid engine is merely an equivalent, for purposes of patent law, to a piston engine. Because you could substitute one for the other. You plunk them right down into the engine compartment, attach them to the differential, and you're good to go. Why in this case do you think that, what is it about the interchangeability that gets the two systems close enough together that it's fair to call them equivalent? Sure. And I think what does that is, in the invention itself, the idea was to describe an invention where modular units could be used. And this is expressed, if I can point the court to a spot right in the column five, lines 18 through 22, the inventor says the invention uses a 3D digitizer system to locate the tip of the probe. So it wouldn't really matter, if I understand your position, if 15 years after issuance, someone invented a system that was much, much better than either sound or the optical system, and hadn't even been conceived at the time of the patent. As long as it was available off the shelf, modular, and could be plunked in there to identify location, that would be an equivalent, if I understand your position. And to satisfy the other elements of what that unit had to do, yes. As this unit did, I agree with that. And your honor, I would just take the court to the Polaris manual itself, in the joint appendix at 36442, where they describe their optical tracking unit that was actually used. And they state in there that the Polaris family of optical tracking systems is a highly versatile, real-time tracking technology. They go on to explain they have an active system, a passive system, and a hybrid system. And then they characterize it, that although Polaris systems use the same base technology, they vary slightly in that they each track different styles of markers. That's all we're talking. Tracking with a microphone versus reflecting the light back and sensing it with a lens. And no matter how much more efficient and effective and commercially viable the second type of tracking system is compared to the first, it would still be equivalent. Well, I think the question, as I would frame it, would be that if you look to the function that it's serving under the function-weighted result test, is it doing that function in substantially the same way? And I would answer that here, under these facts, yes. It absolutely is. Well, let me ask the question this way, then. Suppose that it were to become clear that the sound-based system couldn't get accuracy within more than a centimeter, which obviously would be unacceptable for brain surgery. You want to be closer than that, I assume. But that the optical system could get down to half a millimeter, let's say, in terms of accuracy. Do you still think the two systems would be equivalent? I do. Because at the time the inventor invented the sound-based system, he had that technology. And when you look at it, he didn't give up anything having to do with optical. And so now there is an advance within the spirit of that invention, which in my view is something that the patent laws are aimed at promoting. He ought to be entitled to that range of equivalent where he has not surrendered it. And the art has advanced within the framework of his invention to improve that invention. OK. Thank you, Mr. Luck. We'll save you a little bit of rebuttal time. Thank you, Your Honor. Mr. Campbell. Thank you, Your Honor. May it please the court. What I want to start talking about was the invention. What we didn't really hear much of was what the inventions were of the patents. This court decided in Phillips, we have to look at the inventions. And the claims are construed and constrained by the invention, which we haven't heard a lot about. Dr. Buholtz was nice enough to tell us what his invention was several times. During the prosecution history, he had the opportunity to explain how his invention worked. He explained exactly what it was, how it worked, that you have emitters. And perhaps this will help. You have a probe, and you have emitters on the probe. This is the brain lab version without emitters having a passive version. But he explained you have to have emitters on the probe. And they have to work in a certain way with what he called a microphone array. He also called it an array. If you look through the amendment, he talks about microphone array and array being interchangeable. And in fact, throughout his patent, several times, he referred to the microphones of the array, or the microphone array, or the microphone array 300. So just because he says several times in the amendment that he has an array doesn't mean it's anything broader than a microphone array. Then he goes on to describe how it works. But he says optical in the specification. What's that? He says it can also be optical. It doesn't have to be acoustic. No, Your Honor, that's the Roberts specification. The Buholt specification says nothing about optical. In the patent prosecution history, there's one or two statements that the emitters might be optical. But in any event, it doesn't matter because it still requires active emitters. It requires you have an emitter on the probe, an emitter on the patient, and that that emitter makes a sound. It emits something, which this microphone array will then hear. And the interesting thing about this is it's always sequential. In other words, if I have several emitters going off at the same time, it doesn't work. He explains it has to be sequential. You have to tell the computer, I'm going to first fire the emitter on the head, now the next one on the head, and then the next one. And then I'm going to turn to the probe. And I'm going to look at where that first emitter is and where that second emitter is. I'm going to time how long it takes sound to travel from one emitter to the microphone and do this triangulation to figure things out. But I'm not doing it parallel. I'm not doing it the same way an optical system would. I'm not doing it the way a passive optical system would work. And then he told us something more. He told us my invention requires emitters. My claims were site emitters. My invention uses emitters. I know this is an issue, and the parties have argued back and forth. But I just want to get your views on it. The term emit, I mean, you're using the term in the sense that it has to be not simply a reflective source of energy, a source of energy which is being reflected from an object but had an origin somewhere else, but rather the generator of energy, correct? And the opposing side says it's an emitter if it reflects energy which was generated somewhere else, but nonetheless sends the energy along on its way. And therefore, a reflector counts as an emitter, if I understand that. Well, no, oddly enough, they don't really make that analysis. Well, I thought that was at least, well, perhaps not. I'm asking the wrong person, perhaps, in their position. But I don't want to disparage your argument. But what it is is that the Buholtz invention describes in depth, probably 30, 40, 50 different times, how an emitter works and what an emitter meant to him and meant to the prior art and meant to those with extraordinary skill in the art. And that's something that is provided with power. You have an emitter, you have a wire that connects it to a multiplexer, which connects it to a supply of power, and then at a certain exact instance of time, it's fired, and it makes a sound, it makes a spark, and you can hear that. So based on the fact that there is, you know, a physicist might say that a mirror emits or the windows up here emit, if you look at it at a funny angle, that doesn't mean that they're emitters within the context of the invention. And we have to keep going back to the invention. They try to take the invention right out of the claims. Let me ask you one more question about the invention. And this is, to me, the question of equivalence kind of depends on what was really invented here. Do we have an invention of a system of superimposition of images, or do we have an invention of a system for locating different items? If it's the latter, the equivalence argument becomes harder to make. If it's the former, then the method of locating may become subsidiary to the real core of the invention, and therefore more likely to be amenable to an adductor of equivalence argument. Now, was there, prior to these inventions, and I'm focusing on the 454 and the 056, was there a system of superimposition of images of, in the case of the 056, the MRI or CT scan, and something that's going on on the operating table, or in the case of the 454, a probe or some operating instrument superimposed on an image of the patient? Yes, Your Honor, there were several different devices that did that. There were devices that actually used various forms of doing it. One of the conventional forms was using what was called a robot arm. They did exactly the same thing as pupils basically did, but with a robot arm. Robot arm's a kind of passive device. You take the robot arm, it's connected to a, for example, a lectern here at a very known location, an origin, and you attach it to where you're going. You attach it to points on the head, and by knowing all the different linkages in that bar, you can tell exactly where something was, and you could use that to superimpose then that image onto the MRI image. What Dr. Buchholz did is he first tried to get broader claims and they were rejected. He had to add things to them, and he had to explain his invention. He had to add emitters on the head and on the probe. He had to add a microphone array. So his invention isn't that broad concept of, I'm the first guy to invent image guided surgery. He was unable to get that. His invention was going in a specific way, and that specific way is using microphones arrays and using emitters and that sort of thing. Council said that one of the- You say he added them. I mean, do you mean for purposes of claim one via means plus function, or in claim 14, now talking about the 454, it doesn't have all that limiting language, if I recall correctly. Well, claim 14 restarts with reference means. Reference means. But if reference means for purposes of 14 doesn't mean the same thing it means for purposes of claim one, then- I believe it does. Well, why? And I'm happy to explain why. And the reason why is because reference means doesn't have a meaning in the art. You can't look at a dictionary and look up reference means. You can't ask an expert in the art, what is the reference means? They can't tell you. So you need some other way of determining. The Irideto case, which we cited in our brief, explains how you do that. You look at the spec, it's your private dictionary, and you're constrained then by your private dictionary what it says. The specification only provides one thing, which could be the reference means, and that's the array of microphones. There's nothing else even vaguely discussed. We heard mention of a 3D digitizer. The very next line says, in particular, the 3D digitizer is an acoustic digitizing system. And then throughout the specification, he uses that word digitizing system as having microphones and having emitters and using sound. So just by the fact that there's one line that says digitizer system, that doesn't mean he invented anything broader than what his patent speaks about. And that's in column five. It says the invention uses a 3D digitizer system to locate positions. The very next line is, in particular, an off-the-shelf 3D sonic digitizer. And he goes on to explain how that works with emitters and microphones and all of that. So it's not a broadening disclosure. It's a very, very narrow disclosure. And if we're gonna look and see what this reference means is, we have to look within the four quarters of this patent and understand it, because there's nowhere else you can get that definition. And the reference means is within right here, just an array of microphones. Now, the other thing I said is the Claim 14, at least in our assertion, requires emitters, and emitters on the probe and emitters on the patient. And that's because Dr. Buchholz told us that. Dr. Buchholz told us in his amendment which I've got right here, that his claims, the claims of this application recite a technique or a method and apparatus for the location of an instrument within the patient's head by using emitters on the probe as well as emitters attached to the patient's head. These emitters can be sound or light. But the key is not sound or light. The key is he's using emitters. So if we're talking about our argument-based estoppel argument, it's emitters versus something which doesn't have emitters, active versus passive, something which their experts said are opposites. If we're talking about the argument-based estoppel, then he goes on and says the freehand technique of the invention uses sound or light emitters of the probe. The invention uses emitters. Now, if we're trying to see what it is that he's constrained by, what it is he disavowed, he disavowed something which is not my invention, of course. And he said exactly what his invention is, and that's the use of emitters on the head and on the probe. So I think he, whether he uses the word emitters in Claim 14 or not, he's definitely constraining himself to saying that it's in there. And where you put it in there is probably in the first and second way of determining steps. There's a first step of determining, which is determining where the probe is, and a second step of determining, which is, I guess, where the patient is. What do you reckon? But even accepting all of this, here we have a jury verdict, and to overturn it, there has to be no substantial evidence, which is less than a preponderance in support of it. And that's quite a difficult burden, is it not? Particularly when the theory is equivalence. And so the very points that you've been mentioning might very well avoid any literal construction, but now we have the equivalence issue. Well, on the equivalence, what we know now is we know the way in which the invention works, how the vehicle's invention works. That's what he says in his amendment. He was asked by the inventor, I'm sorry, he was asked by the examiner, how does this work? And he told the examiner how it works. I have emitters, I have a microphone array, and I use sound and triangulation based on that. Acoustically, and then the argument was that the optical system was equivalent. Well, their argument is that, but they never had an expert. And the jury is so found? Well, yes, yes, the jury did. But there's two reasons why we can't really apply much support to that. First off, the jury never made that direct comparison between an acoustic system and the way in which an acoustic system works and the way in which a pass-by system works. Well, how do we know? Whoever was handling it at trial had every opportunity to point that out to the jury. And it was pointed out several times, but what the jury did, what the jury looked at is the comparison of the devices. And what they did is they listened to their expert who said that you don't need to look at the way. There was no expert on the other side? What's that? You said they listened to the expert? Yes, the jury is supposed to choose between conflicting expert opinions. I understand that, but the expert did not make the correct comparison. He did not make the comparison in the correct ways. Well, that's up to the other expert to point that out. Which he did. But the expert point, what their expert said is I have apples and I have oranges. Instead of comparing apples and oranges, comparing optical and acoustic, he said apples and oranges are both fruit. And since they're both fruit, they must be the same. Now that might be a way of doing that out in the world somewhere or doing it in the market, but it's not how you do a doctrine of equivalence analysis. You have to find the way and compare the way in which an acoustic system works to the way in which an optical system works. And that wasn't done. And in fact, the court said that wasn't done. Well, perhaps if the trial was flawed, perhaps that accounted for the jury verdict. This isn't a place to remedy oversights. Well, no, I'm not saying that the trial was flawed in the presentation. I'm saying the trial was flawed in that the correct comparison was not made. And in fact, the district court looked  You're saying the jury chose the wrong expert? If that's what you're- No, no, no, it's not a comparison of who had the best expert or whose expert you can believe in. And in fact, if you read the court's opinion on J-Mal, he doesn't go into who had the best expert. He just relies on their experts. Their experts said, using the correct standard, using the way, that the way in which the brain-like passive optical system works and the way in which an acoustic system works are opposites. They're not equivalents, they're opposites. They're opposites because one's active, one's passive. They're opposites because one of them works sequentially and one of them works in parallel because you can't have a passive optical system which works sequentially. So the judge wasn't looking at who he believed more. It wasn't a credibility determination. It's not for the judge. The jury makes the credibility determination. Exactly, but the judge did not make a credibility decision. He said, using the correct evidence, using the correct way, even look at what Medtronic's expert said. Medtronic's expert said, they're not the same. He said that they are the opposites. And then the judge tried to figure out why the jury went astray. It provides a lot of information as to why that is because there was an incorrect comparison between the devices, between the commercial bodies because Medtronic's counsel misled them based on the FDA submission as being an admission of infringement. And based on those things, it's hard for the jury to go back and really focus on whether the expert really did that correct function way resolve analysis. And because the jury had this easy way out by using the FDA analysis, which was improper according to the court, by using the comparison of the devices and by using those sorts of statements, it didn't make the correct analysis. It wasn't a credibility determination. It didn't do the function way analysis it should have. Thank you. Okay, thank you, Mr. Campbell. Mr. Lefk, I guess we've got a couple of minutes. Mr. Neal. A few quick points for the court. You know, what we're talking about is doctrine of equivalence. You know, and for that purpose, it's, you're not even into doctrine of equivalence until there is a literal infringement. And I'm gonna go back and just try to end, quickly track through why we say the doctrine of equivalence was completely appropriate here, going back to what the art was. And I think, your honor, your question about, you know, framing the scope of the invention and judging the equivalent within that is the correct one. And it harmonizes the question you asked me earlier about substituting a hybrid engine for an auto cycle engine, for example. And here, when you look at what was in the prior art, the robot arm of Adam, that was the prior art, or the box that you would use on the head with Perry to get some coordinates. This is the first invention that allows you to freehand move the tip through the body and track it on those images and conduct surgery the way a surgeon wants to do it. And that's the context in which the invention has to be judged. On the issue of the estoppel, reference means, they said the reference means is an array. They didn't say it's in a mirror, it's an array. Microphone array, camera array, could be either one. But they say, I don't know if this was before the jury or not, but they at least say in their brief that the acoustic system just doesn't work, hasn't been used until this optical system was developed off the shelf or not. It really wasn't a functional operative invention, despite the concept, which one might say the concept wasn't new to be able to track the tip of the probe. Well, I think what is accurate here is that when the optical unit became available, the inventor evaluated and said, yes, I would prefer this to the sound unit that it had advantages over the sound unit. At least they say that it was more than advantages, it became workable. Yes, and that is in the record, that's in the article that was written by Buchholz and Smith. And then last, earlier I pointed it out, but I would invite the court to just look at the function wave result evidence from the expert Brimson at the joint appendix beginning at 7513 through 7516. He addresses every one of the issues on the function wave result test. Could I ask just one more quick factual question? Was it your position at trial that emitters included reflecting devices or was only active generators of energy? No, it was our position that emitters included the reflectors. And in fact, Brimson testified to that from a physics perspective at joint appendix 7523, pages 2470 and 271 of the trial transcript. And that would be further substantial evidence supporting the same way. Okay, thank you, Mr. Locke, Mr. Campbell. Case is taken into submission. The court will adjourn until this afternoon at two o'clock.